**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SHIVA STEIN,<br><br>Plaintiff,<br><br>v.<br><br>L3 TECHNOLOGIES, INC., CLAUDE R. CANIZARES, THOMAS A. CORCORAN, ANN E. DUNWOODY, LEWIS KRAMER, CHRISTOPHER E. KUBASIK, RITA S. LANE, ROBERT B. MILLARD, LLOYD W. "FIG" NEWTON, VINCENT PAGANO, JR., and H. HUGH SHELTON,<br><br>Defendants. | : | CIV. NO. _______________<br><br>**COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Shiva Stein ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

1. This is an action brought by Plaintiff against L3 Technologies, Inc. ("L3 or the "Company"), the members L3's board of directors (the "Board" or the "Individual Defendants" and collectively with the Company, the "Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and 17 C.F.R. § 244.100, in connection with the proposed acquisition of L3 by Harris Corporation and its affiliates ("Harris").

2. Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading Registration Statement on Form S-4 (the

"Registration Statement") to be filed on December 14, 2018 with the United States Securities & Exchange Commission ("SEC") and disseminated to Company stockholders. The Registration Statement recommends that Company stockholders vote in favor of a proposed transaction whereby Leopard Merger Corp. ("Merger Sub"), a wholly owned subsidiary of Harris, will merge with and into L3 with L3 surviving the merger as an indirect, wholly-owned subsidiary of Harris (the "Proposed Transaction"). Pursuant to the terms of the definitive agreement and plan of merger the companies entered into (the "Merger Agreement") each L3 common share issued and outstanding will be converted into the right to receive 1.30 shares of Harris common stock, equal to $201.33 per share based on the closing price of Harris common stock on October 12, 2018, the last trading day before the Proposed Transaction was announced (the "Merger Consideration").

3. L3 and the Board failed to negotiate and obtain a collar provision to be included in the Merger Agreement, which is designed to protect L3 shareholders from dramatic changes in the buyer's stock price between the announcement of the Proposed Transaction and the time of closing. Harris's stock price on October 15, 2018, the day after the announcement of the Proposed Transaction, was $172.44. The stock price has been in a free fall ever since and Harris's closing stock price on December 18, 2018 was only $142.95, a 17.1% decrease, representing a consideration of only $185.83 per share, down from $224.17.

4. Therefore, the consideration L3 stockholders stand to receive in connection with the Proposed Transaction and the process by which Defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other common stockholders of the Company. Defendants have now asked L3's stockholders to support the Proposed Transaction in exchange for inadequate consideration based upon the materially incomplete and

misleading representations and information contained in the Registration Statement, in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Registration Statement contains materially incomplete and misleading information concerning, among other things, (i) L3's and Harris's financial projections, relied upon by the Company's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") in its financial analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Goldman Sachs; and (iii) the background process leading to the Proposed Transaction. The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as L3 stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

5. It is imperative that the material information that has been omitted from the Registration Statement is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

6. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to L3's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant is headquartered in this District, or is an individual who is either present in this District for

jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because L3 is headquartered in this District.

**PARTIES**

10. Plaintiff is, and has been at all relevant times, the owner of L3 common stock and has held such stock since prior to the wrongs complained of herein.

11. Individual Defendant Claude R. Canizares ("Canizares") has served as a member of the Board since May 2003.

12. Individual Defendant Thomas A. Corcoran ("Corcoran") has served as a member of the Board since July 1997.

13. Individual Defendant Ann E. Dunwoody ("Dunwoody") has served as a member of the Board since June 2013.

14. Individual Defendant Lewis Kramer ("Kramer") has served as a member of the Board since July 2009.

15. Individual Defendant Christopher E. Kubasik ("Kubasik") is the Company's Chairman, President and Chief Executive ("CEO") and has been since January 2018. Kubasik previously served as President and Chief Operating Officer ("COO") for two years after joining L3 in October 2015.

16. Individual Defendant Rita S. Lane ("Lane") has served as a member of the Board since May 2018.

17. Individual Defendant Robert B. Millard ("Millard") has served as a member of the Board since April 1997 and is the Company's Lead Independent Director.

18. Individual Defendant Lloyd W. "Fig" Newton ("Newton") has served as a member of the Board since September 2012.

19. Individual Defendant Vincent Pagano, Jr. ("Pagano") has served as a member of the Board since April 2013.

20. Individual Defendant H. Hugh Shelton ("Shelton") has served as a member of the Board since April 2011.

21. Defendant L3 is incorporated in Delaware and maintains its principal offices at 600 Third Avenue, New York, New York 10016. The Company's common stock trades on the New York Stock Exchange under the symbol "LLL."

22. Non-party Harris is incorporated in Delaware and mains its principal offices at 1025 West NASA Boulevard, Melbourne, Florida 32919. Harris' common stock trades on the New York Stock Exchange under the symbol "HRS."

23. Non-party Leopard Merger Sub Inc. ("Merger Sub") is a Delaware corporation and is an indirect wholly-owned subsidiary of Harris, formed solely for the purposes of effectuating the Proposed Transaction.

24. The defendants identified in paragraphs 11-20 are collectively referred to as the "Individual Defendants" or the "Board."

25. The defendants identified in paragraphs 11-21 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. <u>The Proposed Transaction Undervalues L3</u>

26. L3 provides aerospace systems, communication, electronic, and sensor systems used on military, homeland security, and commercial platforms in the United States and internationally. It offers simulation and training, night vision and image intensification

equipment, and security and detection systems; and components, products, subsystems, and systems, as well as related services to military and commercial customers in various business areas, such as total training solutions, power and propulsion systems, aviation products, precision engagement systems, and security and detection systems. The company also provides fleet management support services, procurement, systems integration, sensor development, modifications, and periodic depot maintenance services; modernization and life extension maintenance upgrade and support services; aircraft fabrication and assembly of fixed and rotary wing aero structures, as well as avionics hardware and software systems; and prime mission systems integration and sensor development services. In addition, it offers network and communication systems, secure communications products, radio frequency components, satellite communication terminals and space, microwave and telemetry products, and secure data links. Further, the company provides multi-domain intelligence, surveillance, and reconnaissance mission solutions in various business areas, including space and sensor, airborne sensor, warrior sensor, maritime sensor, and intelligence and mission systems, as well as in advanced programs. It serves the United States (U.S.) Department of Defense and its prime contractors, the U.S. Government intelligence agencies, the U.S. Department of Homeland Security, foreign governments, and commercial customers. The company was formerly known as L-3 Communications Holdings, Inc. and changed its name to L3 Technologies, Inc. in December 2016. L3 Technologies, Inc. was founded in 1997 and is headquartered in New York, New York.

27. On October 14, 2018, the Company and Harris jointly announced the Proposed Transaction:

> MELBOURNE, Fla. & NEW YORK--(BUSINESS WIRE)--Harris Corporation (NYSE:HRS) and L3 Technologies, Inc. (NYSE:LLL) have agreed to combine in an all stock merger of equals to create a global defense technology leader, focused on developing

differentiated and mission critical solutions for customers around the world. Under the terms of the merger agreement, which was unanimously approved by the boards of directors of both companies, L3 shareholders will receive a fixed exchange ratio of 1.30 shares of Harris common stock for each share of L3 common stock, consistent with the 60-trading day average exchange ratio of the two companies. Upon completion of the merger, Harris shareholders will own approximately 54 percent and L3 shareholders will own approximately 46 percent of the combined company on a fully diluted basis.

The combined company, L3 Harris Technologies, Inc., will be the 6th largest defense company in the U.S. and a top 10 defense company globally, with approximately 48,000 employees and customers in over 100 countries. For calendar year 2018, the combined company is expected to generate net revenue of approximately $16 billion, EBIT of $2.4 billion and free cash flow of $1.9 billion.

Harris Chairman, President and Chief Executive Officer, William M. Brown said, "This transaction extends our position as a premier global defense technology company that unlocks additional growth opportunities and generates value for our customers, employees and shareholders. Combining our complementary franchises and extensive technology portfolios will enable us to accelerate innovation to better serve our customers, deliver significant operating synergies and produce strong free cash flow, which we will deploy to drive shareholder value. Integration planning is already underway, and from our extensive experience with integration, we are confident in our ability to realize $500 million of annual gross cost synergies and $3 billion of free cash flow by year 3."
L3 Chairman, President and Chief Executive Officer, Christopher E. Kubasik said, "This merger creates greater benefits and growth opportunities than either company could have achieved alone. The companies were on similar growth trajectories and this combination accelerates the journey to becoming a more agile, integrated and innovative non-traditional 6th Prime focused on investing in important, next-generation technologies. L3 Harris Technologies will possess a wealth of technologies and a talented and engaged workforce. By unleashing this potential, we will strengthen our core franchises, expand into new and adjacent markets and enhance our global presence."

* * *

> "This strategic combination advances our strategy and is immediately accretive to our five-year plan," said Doug Suttles, Harris President & CEO. "Our track record of consistent execution gives us confidence to accelerate and increase shareholder returns. I am very excited to lead the combined company and want to congratulate the team at L3 on doing a tremendous job building premium positions in the core-of-the-core in each of their assets, particularly in the world-class, oil-rich, STACK/SCOOP. When combined with our cube development model, expected synergies and relentless focus on efficiency, we are positioned to deliver highly efficient growth and quality returns."
>
> * * *
>
> **Governance and Leadership**
>
> L3 Harris Technologies will be headquartered in Melbourne, Florida and led by a highly experienced and proven leadership team that reflects the strengths and capabilities of both companies and will share equally in the integration process.
>
> The combined company's Board of Directors will have 12 members, consisting of six directors from each company. William M. Brown will serve as chairman and chief executive officer, and Christopher E. Kubasik will serve as vice chairman, president and chief operating officer for the first two years following the closing of the transaction. For the third year, Mr. Brown will transition to executive chairman and Mr. Kubasik to chief executive officer, after which Mr. Kubasik will become chairman and chief executive officer.
>
> Additional senior leadership positions for L3 Harris Technologies will be determined at a later date.
>
> * * *

28. The Merger Consideration undervalues the Company's shares in light of its recent financial performance and prospects for future growth. More specifically, on the same day the Proposed Transaction was announced, L3 released stellar preliminary third quarter 2018 results. The Company reported preliminary diluted earnings per share ("EPS") from continuing operations of $2.54 and adjusted diluted EPS from continuing operations of $2.85 for the quarter

ended September 28, 2018 compared to the same quarter ended a year ago of $1.79. Net sales increased 10% to $2.5 billion for the quarter compared to the same quarter 2017, while operating income increased 17% from $232 million to $272 million.

29. Accordingly, the Company is well-positioned for financial growth and the Merger Consideration fails to adequately compensate Company stockholders by cutting off their ability to benefit from the Company's continued growth.

30. Despite the inadequate Merger Consideration, the Board has agreed to Proposed Transaction without an exchange ratio collar provision, which would have protected the Company's shareholders from Harris's free-fall stock price. The value of the Proposed Transaction has dropped 17.1% from the date of announcement. It is therefore imperative that L3's stockholders are provided with the material information that has been omitted from the Registration Statement, so that they can meaningfully assess whether or not the Proposed Transaction is in their best interests prior to the forthcoming stockholder vote.

**B. The Materially Incomplete and Misleading Registration Statement**

*Omissions and/or Material Misrepresentations Concerning L3's Financial Projections*

31. On December 4, 2018, L3 and Harris jointly filed the Registration Statement with the SEC in connection with the Proposed Transaction. The Registration Statement was furnished to the Company's stockholders and solicits the stockholders to vote in favor of the Proposed Transaction. The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Registration Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

32. The Registration Statement fails to provide material information concerning financial projections by L3's management and relied upon by Goldman Sachs in its analysis. The Registration Statement discloses management-prepared financial projections for the Company which are materially misleading. The Registration Statement indicates that in connection with the rendering of its fairness opinion, Goldman Sachs reviewed "certain internal financial analyses and forecasts for L3 … prepared by L3's management …as approved for Goldman Sachs' use by L3, including certain estimates of operating synergies projected by the management[] of L3 to result from the merger, as approved for Goldman Sachs' use by L3. Registration Statement at 109. Accordingly, the Registration Statement should have, but fails to provide, certain information in the projections that L3 management provided to the Board and Goldman Sachs. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

33. For the projections for L3, the Registration Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics such as (1) Operating Income and (2) Free Cash Flow, but fails to provide: (i) the line items used to calculate the non-GAAP measures, or (ii) a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a). Registration Statement 118. Operating Income and Free Cash Flow are non-GAAP measures as contemplated by Regulation G.

34. When a company discloses non-GAAP financial measures in a Registration Statement that were relied on by a board of directors to recommend that stockholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

35. The SEC has noted that:

> companies should be aware that this measure does not have a uniform definition and its title does not describe how it is calculated. Accordingly, a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used. Companies should also avoid inappropriate or potentially misleading inferences about its usefulness. For example, "free cash flow" should not be used in a manner that inappropriately implies that the measure represents the residual cash flow available for discretionary expenditures, since many companies have mandatory debt service requirements or other non-discretionary expenditures that are not deducted from the measure.[1]

36. Thus, to cure the Registration Statement the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information in the Registration Statement, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures. At the very least, the Company must disclose the line item forecasts for the financial metrics that were used to calculate the aforementioned non-GAAP

[1] U.S. Securities and Exchange Commission, Non-GAAP Financial Measures, last updated April 4, 2018, available at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm

measures. Such forecasts are necessary to make the non-GAAP forecasts included in the Registration Statement not misleading.

*Omissions and/or Material Misrepresentations Concerning Harris' Financial Projections*

37. The Registration Statement fails to provide material information concerning financial projections by Harris' management and relied upon by Goldman Sachs in its analysis. The Registration Statement discloses management-prepared financial projections for Harris which are materially misleading. The Registration Statement indicates that in connection with the rendering of its fairness opinion, Goldman Sachs reviewed "certain internal financial analyses and forecasts for … Harris prepared by L3's management and for Harris stand-alone prepared by Harris management, and certain financial analyses and forecasts for Harris pro forma for the merger prepared by the management of L3, in each case, as approved for Goldman Sachs' use by L3, including certain estimates of operating synergies projected by the managements of L3 and Harris to result from the merger, as approved for Goldman Sachs' use by L3. Registration Statement at 109. Accordingly, the Registration Statement should have, but fails to provide, certain information in the projections that Harris management provided to the Board and Goldman Sachs.

38. For the projections for Harris, the Registration Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics such as (1) EBIT and (2) Free Cash Flow, but fails to provide: (i) the line items used to calculate the non-GAAP measures, or (ii) a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a). Registration Statement 118. EBIT and Free Cash Flow are non-GAAP measures as contemplated by Regulation G.

*Omissions and/or Material Misrepresentations Concerning Goldman Sachs' Financial Analyses*

39. With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis* ("DCF") of L3 as a stand-alone company, the Registration Statement states:

> Goldman Sachs performed an illustrative discounted cash flow analysis of L3 on a stand-alone basis. Using discount rates ranging from 7.25% to 8.25%, reflecting estimates of L3's WACC, Goldman Sachs discounted to present value as of September 28, 2018, which was the latest quarter end for which financial data were available, (a) estimates of unlevered free cash flow for L3 for the calendar fourth quarter of 2018 and the calendar years 2019 through 2023 and (b) a range of illustrative terminal values for L3, which were calculated by applying perpetuity growth rates ranging from 2.25% to 2.75% to a terminal year estimate of the unlevered free cash flow to be generated by L3, which analysis implied exit terminal year EBITDA multiples ranging from 11.1x to 14.8x. Goldman Sachs derived such discount rates by application of the capital asset pricing model, which requires certain company-specific inputs, including L3's target capital structure weightings, the cost of long-term debt, after-tax yield on permanent excess cash, if any, future applicable marginal cash tax rate and a beta for L3, as well as certain financial metrics for the United States financial markets generally. The range of perpetuity growth rates was estimated by Goldman Sachs utilizing its professional judgment and experience, taking into account the management projections and market expectations regarding long-term real growth of gross domestic product and inflation. The estimates of unlevered free cash flow used in the calculations described above were approved for use by L3 after being calculated by Goldman Sachs using information set forth in the management projections.

40. The Registration Statement fails, however, to disclose the Company's (i) estimates of unlevered free cash flow for L3 for the calendar fourth quarter of 2018 and calendar years 2019 through 2023, (ii) the line items used to calculate each company's unlevered free cash flows; (iii) company-specific inputs, which included: "L3's target capital structure weightings, the cost of long-term debt, after-tax yield on permanent excess cash, if any, future applicable marginal cash tax rate and a beta for L3, as well as certain financial metrics for the United States financial markets generally" utilized by Goldman Sachs to derive discount rates ranging from 7.25% to 8.25%. Registration Statement at 110. Also omitted from the Registration Statement is (i) the amount of net debt, of L3 (including minority interests liabilities) as of September 28, 2018, amounts attributable to tax-effected pension underfunding and other post-employment

benefits as of December 31, 2017. These figures were used by Goldman to derive the range of illustrative enterprise values for L3.

41. The Registration Statement also states that Goldman Sachs performed an illustrative DCF analysis on the pro forma combined company taking into account the estimated synergies. Registration Statement at 110. The Registration Statement disclosed that Goldman Sachs used discount rates ranging from 7.00% to 8.00%, reflecting estimates of the WACC for the pro forma combined company, and discounted to present value as of September 28, 2018 (a) estimates of unlevered free flow for the pro forma combined company for the calendar fourth quarter of 2018 and the calendar years 2019 through 2023, as reflected in the management projections and (b) a range of illustrative terminal values for the pro forma combined company, which were calculated by applying perpetuity growth rates ranging from 2.25% to 2.75% to a terminal year estimate of the unlevered free cash flow to be generated by the pro forma combined company, which analysis implied exit terminal year EBITDA multiples ranging from 12.2x to 16.6x. However, the Registration Statement fails to disclose unlevered free cash flow or the range of illustrative terminal values. Also omitted from the Registration Statement are (i) combined company's target capital structure weightings, (ii) the cost of long-term debt, (iii) after-tax yield on permanent excess cash. These figures were used by Goldman Sachs to derive the discount rates and ultimately the illustrative enterprise values for the pro forma combined company.

42. The Registration Statement also omits material information concerning Goldman's *Illustrative Present Value of Future Share price Analysis*, which was "an illustrative analysis of the implied present value of an illustrative future price per share of both (a) L3 common stock (including cumulative dividends) and (b) the pro forma combined company

common stock (including cumulative dividends)" by calculating "the implied values per share of L3 common stock as of the fiscal years ended December 31, 2019 to 2021, by applying a range of next twelve months price to earnings, which is referred to as NTM P/E multiples of 17.0x to 21.0x to the next twelve month earnings per share estimates for L3, and then discounting such implied values back to September 28, 2018, using an illustrative discount rate of 8.75%, reflecting an estimate of L3's cost of equity." Registration Statement at 111. The Registration Statement fails to disclose Goldman's basis for the next twelve months' price-to-earnings per share ratios of 17.0x to 21.0x. Also, the Registration Statement fails to disclose the underlying inputs used to derive the discount rate of 8.75%.

43. Goldman Sachs also did a similar calculation for the pro forma company, and obtained a range of implied present blues by "the implied values per share of the pro forma company common stock as of December 31 for each of the years 2019 to 2021 by applying a range of NTM P/E multiples of 17.0x to 21.0x to the next twelve month earnings per share estimates for the pro forma company," and then discounting such implied values back to September 28, 2018, using an illustrative discount rate of 8.75%, reflecting an estimate of the pro forma company's cost of equity. Registration Statement at 112. The Registration Statement fails to disclose Goldman's basis for the next twelve months' price-to-earnings per share ratios of 17.0x to 21.0x. Also, the Registration Statement fails to disclose the underlying inputs used to derive the discount rate of 8.75%.

44. In sum, the omission of the above-referenced information renders statements in the Registration Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Transaction, Plaintiff will be unable to make a

fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### On Behalf of Plaintiff Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100

45. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

46. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

47. Defendants have issued the Registration Statement with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Registration Statement and the use of their name in the Registration Statement, which fails to provide critical information regarding, amongst other things: the financial projections that were prepared by the Company and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

48. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that

were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

49. Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of strategic alternatives and the Company's financial projections.

50. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

51. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52. The Individual Defendants acted as controlling persons of L3 within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors

of L3, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of L3, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

53. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of L3, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Registration Statement at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction. The Individual Defendants were thus directly involved in the making of the Registration Statement.

55. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

56. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

58. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in her favor and against the Defendants jointly and severally, as follows:

A. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Registration Statement;

A. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

B. Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: December 19, 2018

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: */s/ Gloria Kui Melwani*
270 Madison Avenue
New York, New York 10016
Telephone: 212-545-4600
Facsimile: 212-686-0114
Email: melwani@whafh.com

*Attorneys for Plaintiff*